UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DELONNY DAVIS,

                        Plaintiff,

    -against-

NYPD OFFICER NIKOLAOS LIANDRAKIS, shield number 14803, in his individual capacity; NYPD OFFICER SHAMARI ROBERTS, shield number 14926, in his individual capacity; NYPD OFFICER PRONAB ADHIKARY, shield number 24176, in his individual capacity; NYPD OFFICER ERNEST HERNANDEZ, Tax ID number 951815, in his individual capacity; NYPD OFFICER MINZHONG ZHU, Tax ID number 953605, in his individual capacity; NYPD OFFICER ELVIS RIVERA, shield number 14648, in his individual capacity; NYPD OFFICER ANDREW MAHONEY, shield number 3150, in his individual capacity; NYPD OFFICER NAZIR NAZARY, shield number 7169, in his individual capacity; NYPD CHIEF OF DEPARTMENT JOHN CHELL; NYPD DEPUTY COMMISSIONER KAZ DAUGHTRY; John Does #1-10; Richard Roes #1-10, and THE CITY OF NEW YORK,

                        Defendants.

---

**COMPLAINT AND JURY TRIAL DEMAND**

Case No. <u>25-cv-8501</u>

---

Plaintiff Delonny Davis, by and through his attorneys, Wylie Stecklow, PLLC and Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for his Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.     On August 28, 2023, Plaintiff Delonny Davis was driving his moped in the bike lane of East 2nd Street in Manhattan when New York City Police Officer Nikolaos Liandrakis swerved the unmarked NYPD vehicle he was driving out of the middle lane of traffic, into the bike lane, and intentionally struck Mr. Davis head-on.

2.     This was not an accident. Between late 2022 and early 2025, the official policy of the New York City Police Department was to encourage officers to use their *vehicles* as

instrumentalities of force – to pursue, cut off, collide into, and otherwise seek to interdict and restrain motorists who had or were alleged to have violated the traffic laws. Specifically, officers were told to intentionally drive into, in front of, or dangerously near other motor vehicles as a means of restraining their operators. The NYPD's policy on this matter was spearheaded by then-Chief of Patrol and former Chief of Department, John Chell—and Deputy Police Commissioner Kaz Daughtry.

3.     Defendants Chell and Daughtry were also the moving forces behind the NYPD's Community Response Team ("CRT"), a secretive unit of plainclothes officers whose history of misconduct has been well-documented. *See* pp. 19-20 *infra*. Defendants Liandrakis, Roberts, Adhikary, Hernandez, Rivera, Zhu, Nazary, and Mahoney (collectively, the "Officer Defendants") were all members of the CRT.

4.     In the case of Mr. Davis, the consequences of the implementation of this policy were life-changing: he was thrown off his moped into the air and landed headfirst on the windshield and hood of the police car, at which point he fell onto the street and lost consciousness. As a result, and in addition to other injuries, Mr. Davis suffered permanent hearing impairment and ongoing pain and soreness to his body.

5.     Literally adding legal insult to physical injury, no sooner did Mr. Davis emerge from unconsciousness, than Defendants Liandrakis, Roberts, and Adhikary placed him in handcuffs as he lay in the middle of the street. They denied him medical treatment and then arrested and charged Mr. Davis charged with – among other things – reckless endangerment and reckless driving.

6.     The actions of Officer Liandrakis and other Officer Defendants were all captured on surveillance video. Upon realizing that they would have to account for the crash and Mr.

Davis' resulting injuries, Defendants Liandrakis and Rivera made false statements to the

Manhattan District Attorney's Office, specifically blaming Mr. Davis for the collision.  One

written statement asserts that it was Mr. Davis who crashed into the "police vehicle *that was*

*attempting to avoid the collision*."  The Officer Defendants also stated in the Police Accident

Report that Mr. Davis was traveling in the same lane as the NYPD vehicle.  Surveillance video

demonstrates conclusively that these statements were false: the NYPD vehicle operated by

Officer Liandrakis intentionally crossed from the middle lane of vehicular traffic into the bike

lane to strike Mr. Davis.

7.      In February 2025, after over two years of improper and unconstitutional vehicle

pursuits and uses of force-by-police-vehicle, NYPD Commissioner Tisch issued a directive

prohibiting officers from engaging in vehicle pursuits for low-level offenses like traffic

violations or nonviolent misdemeanors and limiting such pursuits to felonies and violent

misdemeanors.  This order came too late for Delonny Davis and others injured by the NYPD

policy encouraging officers to use their vehicles as instrumentalities of force.

## JURISDICTION AND VENUE

8.      This action seeks redress pursuant to 42 U.S.C. § 1983 for Defendants' violations

of rights protected by the Fourth and Fourteenth Amendments to the United States Constitution.

9.      This Court has subject matter jurisdiction over Plaintiff's federal law claims

pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws

of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color

of state law, of rights guaranteed by the Constitution of the United States.

10.     This Court has supplemental jurisdiction over all of Plaintiff's state and city law

claims pursuant to 28 U.S.C. § 1367, because all of those claims derive from the same nucleus of

operative facts as Plaintiff's federal claims and are part of the same case or controversy that gives rise to the federal claims and causes of action here.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## JURY DEMAND

12.     Plaintiff demands a trial by jury in the action.

## PARTIES

13.     At all times relevant to this Complaint, Plaintiff Delonny Davis was a resident of Bronx County, in the City of New York, State of New York.

14.     At all times relevant to this Complaint, Defendant NYPD Officer Nikolaos Liandrakis, Shield No. 14803, was a duly sworn police officer. In his role, Defendant Liandrakis was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Liandrakis is sued in his individual capacity. Upon information and belief, Defendant Liandrakis was assigned to the NYPD's Community Response Team ("CRT").

15.     At all times relevant to this Complaint, Defendant NYPD Officer Shamari Roberts, Shield No. 14926, was a duly sworn police officer. In his role, Defendant Roberts was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Roberts is sued in his individual capacity. Upon information and belief, Defendant Roberts was assigned to the CRT.

16.     At all times relevant to this Complaint, Defendant NYPD Officer Pronab Adhikary, Shield No. 24176, was a duly sworn police officer. In his role, Defendant Adhikary

was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Adhikary is sued in his individual capacity. Upon information and belief, Defendant Adhikary was assigned to the CRT.

17.    At all times relevant to this Complaint, Defendant NYPD Officer Elvis Rivera, Shield No. 14648, was a duly sworn police officer. In his role, Defendant Rivera was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Rivera is sued in his individual capacity. Upon information and belief, Defendant Rivera was assigned to the CRT.

18.    At all times relevant to this Complaint, Defendant NYPD Sergeant Ernest Hernandez, Tax ID 951815, was a duly sworn police officer with the rank of Sergeant. In his role, Defendant Hernandez was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Hernandez is sued in his individual capacity. Upon information and belief, Defendant Hernandez was assigned to the CRT.

19.    At all times relevant to this Complaint, Defendant NYPD Lieutenant Minzhong Zhu, Tax ID 953605, was a duly sworn police officer with the rank of Lieutenant. In his role, Defendant Zhu was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Zhu is sued in his individual capacity. Upon information and belief, Defendant Zhu was assigned to the CRT.

20.     At all times relevant to this Complaint, Defendant NYPD Detective Andrew Mahoney, Shield No. 3150, was a duly sworn police officer with the rank of Detective.  In his role, Defendant Mahoney was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, he acted within the scope of his employment and under color of state law.  Defendant Mahoney is sued in his individual capacity.  Upon information and belief, Defendant Mahoney was assigned to the CRT.

21.     At all times relevant to this Complaint, Defendant NYPD Detective Nazir Nazary, Shield No. 7169, was a duly sworn police officer with the rank of Detective.  In his role, Defendant Nazary was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, he acted within the scope of his employment and under color of state law. Defendant Nazary is sued in his individual capacity.  Upon information and belief, Defendant Nazary was assigned to the CRT.

22.     At all times relevant to this Complaint, Defendant John Chell, Tax ID 905942, was an NYPD official employed by Defendant the City.  Chell was employed by the NYPD beginning in 1994 and became Chief of Patrol in December 2022.  Defendant Chell was subsequently promoted to Chief of Department in January 2025.  Defendant Chell retired from the NYPD in October 2025.

23.     Defendant Chell was responsible for implementing the policy authorizing and encouraging NYPD officers to use unmarked NYPD vehicles to cut off and/or collide with civilians operating motor vehicles allegedly in violation of law, notwithstanding and with deliberate indifference to the proportionate risk to such civilian-operators and others.

24.     At all relevant times, Defendant Chell acted under color of law and in the course and scope of his duties and authority as an officer, agent, servant, and employee of Defendant

City, or was otherwise engaging in conduct incidental to the performance of his lawful functions in the course of exercising said duties and authority.

25.     At all times relevant to this Complaint, Defendant Kaz Daughtry was an NYPD official employed by Defendant the City, holding the rank of Assistant Commissioner.  At all relevant times, Defendant Daughtry acted under color of law and in the course and scope of his duties and authority as an officer, agent, servant, and employee of Defendant City, or was otherwise engaging in conduct incidental to the performance of his lawful functions in the course of exercising said duties and authority.

26.     Defendant Daughtry, along with Defendant Chell, formed the Community Response Team, which was tasked with carrying out dangerous and aggressive vehicle pursuits.

27.     Defendant, City of New York ("the City"), is a municipal corporation duly organized and existing under the laws of the State of New York.  The City is authorized by law to maintain a police department, the New York City Police Department ("NYPD"), which is authorized to perform all functions of a police department per the applicable sections of the New York State Criminal Procedure Law.  At all times relevant hereto, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters, including the appointment, training, supervision, and conduct of all NYPD personnel.  In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States and of the State of New York.

28.     Defendant NYPD Officers John Does #1-10 (collectively the "Doe Defendants'), names and shield numbers unknown, were each at all relevant times officers of the NYPD, and each was a duly appointed and acting officer, servant, employee, and/or agent of the City of New

York.  At all relevant times, Defendants Does #1-10 acted within the scope of their employment and under color of state law.  The Doe Defendants are sued in their individual capacities.

29.    Defendant NYPD Supervisors Richard Roes #1-10 (collectively the "Roe Defendants"), names and shield numbers unknown, were each at all relevant times supervisors at the NYPD, and each was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, Defendants Roes #1-10 acted within the scope of their employment and under color of state law.  The Roe Defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS

***NYPD Officer Liandrakis Intentionally Crashes Into Mr. Davis in a Head-On Collision***

30.    On August 28, 2023, at approximately 4:30 p.m., Mr. Davis left his friend's house and drove his moped Southbound on Avenue D towards the Boost Mobile Store at 200 East 2nd Street in Manhattan to get his cellphone repaired.



31.     As he was driving, Mr. Davis noticed a car—later revealed to be an unmarked NYPD vehicle—that appeared to be following him.

32.     Mr. Davis proceeded to turn right on East 2nd Street and drove westbound to approach the Boost Mobile store.

33.     Concerned as to why someone would be following him, Mr. Davis initially drove past the Boost Mobile store.

34.     Realizing that he had missed the store, Mr. Davis turned around and drove the short distance back eastbound in the bike lane.

35.     As Mr. Davis rode eastbound in the bike lane and approached the Boost Mobile, Defendant Liandrakis quickly swerved his unmarked NYPD vehicle out of the middle lane of

vehicular traffic and directly into the bike lane, intentionally striking Mr. Davis head-on with the NYPD vehicle.

36.     The collision threw Mr. Davis into the air and sent him crashing down on the hood of the NYPD vehicle.

37.     Mr. Davis' head struck the windshield with such force that the windshield on the NYPD vehicle cracked.  Mr. Davis fell onto the street and lost consciousness.

38.     The NYPD car crashed into the sidewalk curb at an angle, resulting in the car's front passenger side tire landing on the curb.

 

39.     Defendants Roberts and Adhikary were also present when the collision occurred.

40.     Mr. Davis awoke to Defendants Liandrakis, Roberts, and Adhikary placing handcuffs on him.

41.     Mr. Davis immediately complained of dizziness and pain in his legs, arms, ribs, and neck.  Mr. Davis' legs were swollen and bloody as a result of the crash.

42.     At approximately 4:50 p.m., an ambulance arrived at the scene.

43.     Defendants Liandrakis, Roberts, and Adhikary escorted Mr. Davis—who was still handcuffed—to the ambulance, where he received a brief evaluation by EMT workers inside the ambulance.

44.     While Mr. Davis was inside the ambulance, another unmarked police vehicle and numerous other CRT officers arrived at the scene.

45.     Upon information and belief, Defendants Hernandez, Zhu, Rivera, Nazary, and Mahoney also arrived at the scene of the collision.

46.     Following his brief evaluation by EMTs, Mr. Davis was ordered out of the ambulance.

47.     Notwithstanding Mr. Davis' continued complaints of pain and dizziness, the Officer Defendants refused to allow Mr. Davis to go to the hospital for further evaluation and treatment.

48.     Instead, the Officer Defendants arrested Mr. Davis and transported him to a nearby police precinct for processing.

49.     Mr. Davis was limping and bleeding as he was placed into his cell.

50.     Mr. Davis was detained for several hours and received no medical treatment while he waited, despite his obvious injuries and requests for medical care.

51.     After several hours, Mr. Davis was issued a desk appearance ticket and released.

52.     When he finally arrived home and tried to sleep that evening, Mr. Davis experienced severe pain in his ears that kept him awake all night.

53.     As a result of this excruciating pain and inability to sleep, Mr. Davis had difficulty caring for his son over the next several days, including getting him to school on time.

54.     Mr. Davis is a stay-at-home dad and takes his childcare responsibilities, particularly the care of his nine-year-old son, very seriously.

***Defendants Knowingly Submit a False Police Accident Report***

55.     Following the collision, Defendant Hernandez completed and signed a Police Accident Report.

56.     Defendant Zhu is listed as the Reviewing Officer of the Police Accident report and indicated that he reviewed the Report on August 29, 2023 at 06:53.

57.     The Police Accident Report states that Vehicle 1 ("V1") was the NYPD vehicle operated by Defendant Liandrakis.

58.     The Police Accident Report falsely states that V1—Defendant Liandrakis—was "going straight traveling westbound when V2 collided with the front of his vehicle as V2 was traveling against traffic going the wrong way."

59.     As is clear from the surveillance video, Defendant Liandrakis was in fact *not* "going straight traveling westbound when V2 collided with the front of his vehicle as V2."

60.     Instead, it was Mr. Davis who was "going straight," traveling eastbound in the bike lane when Defendant Liandrakis intentionally crossed from the middle lane of traffic into the bike lane and collided directly into Mr. Davis' moped.



61.     Defendant Hernandez attached a diagram to the Police Accident Report, reviewed by Defendant Zhu, that falsely depicts Vehicle 1 and Vehicle 2 as being in the same lane of traffic headed directly towards one another.



62.     This diagram is a false representation of the collision between Defendant Liandrakis (Vehicle 1) and Mr. Davis (Vehicle 2).

63.     Defendant Liandrakis and Mr. Davis were not driving in the same lane before the time of the accident.

64.     Defendant Liandrakis was driving in the middle lane of vehicular traffic, while Mr. Davis was driving in the bike lane, directly next to the curb.



65.     Defendant Liandrakis intentionally swerved into the bike lane to cut off and hit Mr. Davis.  As a result, Mr. Davis was thrown off his moped and Defendant Liandrakis (Vehicle 1) crashed into the curb at an angle.

***Defendants Knowingly Provide False Information in Support of a Criminal Complaint***

66.     Following the collision, Mr. Davis was criminally charged with reckless endangerment, reckless driving, aggravated unlicensed operation of a motor vehicle, driving the wrong direction on a one-way street, and driving a motor vehicle without a license.

67.     In connection with the criminal complaint filed against Mr. Davis, Defendant Liandrakis falsely reported to Defendant Rivera that Mr. Davis had "crashed into a police vehicle that was attempting to avoid the collision."

68.     Contrary to Defendant Liandrakis and Defendant Rivera's false statements, Defendant Liandrakis was not attempting to "avoid the collision."  Instead, it was Defendant Liandrakis who *caused* the collision with Mr. Davis.

69.     On September 12, 2023, the reckless endangerment charge against Mr. Davis was dismissed.

*Mr. Davis Suffers Lasting Physical and Emotional Damages*

70.     Mr. Davis has experienced significant physical and emotional distress due to Defendants' unjustified and violent collision.

71.     Immediately following the crash, Mr. Davis experienced intense dizziness and headaches at least once per week.

72.     Since the crash, Mr. Davis has continued to suffer pain in his knee, neck, and rib that can last for days at a time.

73.     As a result of the crash, Mr. Davis has also experienced severe ear pain and hearing loss in his right ear, which continues to this day.

74.     These injuries have directly impacted Mr. Davis' life, including his ability to care for his young son and complete basic tasks.

75.     In addition to his physical injuries, Mr. Davis experienced, and continues to experience, significant emotional distress due to Defendants' actions.

*The NYPD Had an Unconstitutional Policy of Aggressive and Dangerous Vehicle Pursuits*

76.     Beginning in late 2022, the NYPD instituted a policy authorizing and encouraging NYPD officers to use unmarked NYPD vehicles to cut off and/or collide with civilians operating motor vehicles allegedly in violation of law, notwithstanding and with deliberate indifference to the proportionate risk to such civilian-operators and others.

77.     This policy and practice was spearheaded and championed by then-Chief of Patrol Defendant John Chell.

78.     Chell implemented this policy without officially amending NYPD's formal policies and guidelines that dictate the limited circumstances in which vehicle pursuits are permitted.[1]

79.     The NYPD's Community Response Teams are primarily responsible for conducting these dangerous and aggressive vehicle pursuits.

80.     The NYPD's Community Response Teams were formed by Chell and Deputy Commissioner Kaz Daughtry.

81.     Community Response Team officers are plainclothes NYPD officers who typically wear polo shirts and khakis and drive unmarked police vehicles, like the one that collided into Mr. Davis.

82.     Chell and Daughtry consistently praised CRT's pursuits of all-terrain vehicles, illegal scooters, and "ghost cars" with illicit license plates as being necessary for public safety.

83.     In light of this policy, beginning in December 2022, the number of dangerous and oftentimes fatal vehicle pursuits by CRT began to skyrocket.

84.     From January 2023 to June 2023, there were 625 recorded vehicle pursuits, more than the number of pursuits in the previous five years combined.[2]

85.     The following chart depicts the rise in police pursuits following Chell's appointment as Chief of Patrol:

---

[1] *See* Gonen, Y. & Bhat, S., *More NYPD Vehicle Pursuits in Last Six Months Than Prior Five Years Combined*, THE CITY (July 21, 2023), publicly available at: https://www.thecity.nyc/2023/07/21/nypd-car-chase-increase-chell/; *See also* Gonen, Y., Bhat, S., & Siegel, H., *NYPD Car Chases Up Massively Under Mayor Adams — With Sometimes Fatal Results*, (December 16, 2024), publicly available at: https://www.thecity.nyc/2023/07/05/nypd-car-chases-eric-adams-quality-life-community/.

[2] Gonen, Y. & Bhat, S., *More NYPD Vehicle Pursuits in Last Six Months Than Prior Five Years Combined*, THE CITY (July 21, 2023), publicly available at: https://www.thecity.nyc/2023/07/21/nypd-car-chase-increase-chell/.



**Crashes** Following **Police Pursuits** Shot Up After Key Police Appointments Under **Eric Adams' Administration**

The toll began to slow down this year — but both numbers are still overall up notably so far this year compared to the same time periods last year.

**Methodology Notes:** Crash numbers are drawn from NYPD motor vehicle collision records with "police pursuit" marked as the "pre-crash action." Data on crashes and pursuits is current through November and September, respectively.

Chart: Haidee Chu / THE CITY · Source: Motor vehicle collision records – NYPD; Calls for service – NYPD          **THE CITY**

86.     The following chart depicts the rise in police pursuits from 2018 through 2023:



**NYPD Hits the Gas on Car Chases**

Number of vehicle pursuits recorded in NYPD's 911 system from Jan. 1, 2018 to June 30, 2023

Chart: Suhail Bhat / THE CITY · Source: NYPD Calls for Service          **THE CITY**

87.     Chell has lauded the CRT's efforts, boasting, "With the enforcement of more moving summonses and car stops, and people thinking they can take off on us? . . . .  Those days are over."[3]

88.     Chell has also declared that "Yes, vehicle pursuits are up . . . .  And I'll say it again: The days of driving around this city lawless, doing what you think you're gonna do, it's over."[4]

89.     From January to November 2024, "an unprecedent 398 vehicle crashes were preceded by police pursuits, resulting in at least 315 people injured – up 47% from the 215 people injured over the same period last year."[5]

90.     These dangerous and terrifying pursuits led to more than 600 injuries and at least seventeen fatalities from December 2022 through 2024.[6]

91.     According to Police Commissioner Jessica Tisch, twenty-five percent of the vehicle chases in 2024—equal to 570 crashes or more than one-and-a-half per day—resulted in collisions that caused property damage or physical injury.[7]

---

[3] Brosnan, E., *NYPD chief attributes more car chases to rise in 'ghost vehicles*,' SPECTRUM NEWS (July 10, 2023), publicly available at https://ny1.com/nyc/all-boroughs/mornings-on-1/2023/07/10/nypd-chief-attributes-more-car-chases-to-rise-in--ghost-vehicles-.

[4] Gonen, Y. & Bhat, S., *More NYPD Vehicle Pursuits in Last Six Months Than Prior Five Years Combined*, THE CITY (July 21, 2023), publicly available at https://www.thecity.nyc/2023/07/21/nypd-car-chase-increase-chell/.

[5] Gonen, Y. & Chu, H., *More Than a Crash a Day as NYPD Keeps Pedal to the Metal on Car Crashes*, THE CITY (Dec. 16, 2024), publicly available at https://www.thecity.nyc/2024/12/16/nypd-police-car-crashes-chases/.

[6] Gonen, Y., *Video of NYPD Pursuit Shows Cops Abandoning Site of Deadly Crash*, THE CITY (June 5, 2025), publicly available at https://www.thecity.nyc/2025/06/05/nypd-police-deadly-crash-pursuit/

[7] Gould, J, *Here's What to Know About the NYPD's New Car Chase Rules*, GOTHAMIST (March 11, 2025), publicly available at https://gothamist.com/news/heres-what-to-know-about-the-nypds-new-car-chase-rules.

92.    In a collision shockingly similar to Defendants' crash into Mr. Davis, in May 2023, a Community Response Team swerved its unmarked car across traffic on the University Heights Bridge and hit Samuel Williams head on, sending him flying off his dirt bike.  Mr. Williams died from his injuries.[8]

93.    Notwithstanding, Chell has consistently praised the Community Response Teams' vehicle pursuits, declaring: "We're pretty good at it, and we're going to continue stopping cars and bikes that are breaking the law."[9]

94.    In February 2025, after over two years of these rampant and unconstitutional pursuits, NYPD Commissioner Tisch issued a directive prohibiting officers from engaging in vehicle pursuits for low-level offenses like traffic violations or nonviolent misdemeanors and limiting such pursuits to felonies and violent misdemeanors.[10]

95.    Commissioner Tisch admitted that the NYPD's "pursuits for violations and low-level crimes can be both potentially dangerous and unnecessary."[11]

---

[8] Umansky, E, *How Eric Adams Has Backed a Secretive NYPD Unit Ridden with Abuses*, PROPUBLICA (March 11, 2025), publicly available at https://www.propublica.org/article/eric-adams-nypd-community-response-team-police-nyc-misconduct-transparency.

[9] Gonen, Y., *NYPD Chief Instructs Cops to Take Care with Car Chases*, THE CITY (Aug. 16, 2023), publicly available at https://www.thecity.nyc/2023/08/16/nypd-chief-internal-memo-car-chases-safety/.

[10] Gould, J, *Here's What to Know About the NYPD's New Car Chase Rules*, GOTHAMIST (March 11, 2025), publicly available at https://gothamist.com/news/heres-what-to-know-about-the-nypds-new-car-chase-rules;  Gonen, Y., *New NYPD Commissioner Reverses Course on Deadly Vehicle Pursuits*, THE CITY (Jan. 15, 2025), publicly available at https://www.thecity.nyc/2025/01/15/nypd-jessica-tisch-police-car-chases/.

[11] Gonen, Y., *New NYPD Commissioner Reverses Course on Deadly Vehicle Pursuits*, THE CITY (Jan. 15, 2025), publicly available at https://www.thecity.nyc/2025/01/15/nypd-jessica-tisch-police-car-chases/.

96.     According to Commissioner Tisch, two-thirds of the 2,278 pursuits that occurred in 2024 under the old policy would *not* be permitted under the NYPD's new policy.[12]

***NYPD Community Response Teams Have Been Plagued by Misconduct***

97.     The leaders and members of the NYPD Community Response Teams have a long history of misconduct.

98.     According to a ProPublica analysis of Civilian Complaint Review Board records, more than half of the officers assigned to the CRT have been found to have engaged in misconduct at least once in their career, as compared to about 15% of officers across the NYPD. More than 40 officers assigned to the CRT have three or more cases of substantiated misconduct.[13]

99.     Defendant Daughtry, one of the founders of the CRT, has been found by the Civilian Complaint Review Board to have repeatedly engaged in misconduct, including for pointing a gun and threatening to kill a motorcyclist.[14]

100.    Defendant Chell, another leader of the CRT, was found liable by a civil jury for intentionally fatally shooting a man in 2008.  Chell claimed he fired the gun by accident and was never criminally charged.[15]

---

[12] Gould, J, *Here's What to Know About the NYPD's New Car Chase Rules*, GOTHAMIST (March 11, 2025), publicly available at https://gothamist.com/news/heres-what-to-know-about-the-nypds-new-car-chase-rules.

[13] Umansky, E, *How Eric Adams Has Backed a Secretive NYPD Unit Ridden with Abuses*, PROPUBLICA (March 11, 2025), publicly available at https://www.propublica.org/article/eric-adams-nypd-community-response-team-police-nyc-misconduct-transparency.

[14] *Id.*

[15] Grench, E., *Brooklyn Woman Baffled by Lack of Punishment for Copy Who Killed Her Son*, THE CITY (Apr. 15, 2021), publicly available at https://www.thecity.nyc/2021/04/25/brooklyn-nypd-cop-killed-womans-son-no-punishment/.

101.    Defendant Officer Liandrakis, a member of the CRT, has an extensive record of alleged misconduct, including allegations of excessive force, false arrest, and malicious prosecution.[16]

102.    Defendant Officer Roberts, a member of the CRT, also has a record of alleged misconduct, including allegations of excessive force.[17]

103.    Defendant Officer Adhikary has a record of alleged misconduct, including allegations of false arrest and malicious prosecution.[18]

104.    Defendant Officer Hernandez, a member of the CRT, has an extensive record of alleged misconduct, including allegations of excessive force that have been substantiated by the Civilian Complaint Review Board.[19]

105.    Daughtry and Chell have intentionally sought to limit publicly available information about the CRT.  The CRT is not mentioned on NYPD's website, despite being frequently featured on NYPD social media pages.

106.    Upon information and belief, there are no policies, procedures, or operations guides specifically applicable to CRT or specifically related to training CRT officers.

107.    Upon information and belief, there are no written procedures for recruitment for officers or supervisors in CRT.

---

[16] *See e.g., Complaint #202005476, July 2020,* available at *https://www.50-a.org/officer/K6J7*; *Complaint #202403970, April 2024,* available at *https://www.50-a.org/complaint/202403970*; *Lastres v. City of New York et al.*, Index No. 159808, Doc. No. 1 (Oct. 28, 2021).

[17] *See Complaint #202403970, April 2024,* available at *https://www.50-a.org/complaint/202403970.*

[18] *See Trovato v. City of New York et al.*, Index No. 159292, Doc No. 1 (Oct. 31, 2022).

[19] *See Complaint #202401601, February 2024* available at *https://www.50-a.org/complaint/202401601*; *Complaint #202203080* (February 2024), available at *https://www.50-a.org/complaint/202203080*; *Complaint #201303276,* (April 2013), available at *https://www.50-a.org/complaint/201303276.*

108.    A 2023 audit of CRT found that CRT officers frequently went out on patrols even though they were not officially assigned to the team, making it difficult for commanders to track which officers were involved in particular actions.[20]

109.    The audit also found that CRT officers often turned on their body-worn cameras too late to record full incidents, in violation of the patrol guide.[21]

110.    A report by of the City of New York Department of Investigation stated:

The lack of transparency regarding NYPD's Community Response Team ("CRT") risks non- compliance with the law, ethical breaches, and negative policing outcomes. Since its inception more than two years ago, CRT has expanded significantly, with a team in every Patrol Borough, without a corresponding expansion of publicly available information about the work of this unit. The recommendations in this Report encourage the creation of public policies and procedures that will enhance knowledge of and confidence in CRT's mission as well as facilitate future oversight.[22]

111.    Matthew V. Pontillo, former NYPD Chief of the Risk Management Bureau, expressed concern about CRT and the dangerous practice of vehicle pursuits implemented by Chell.  In 2023, Pontillo issued an internal report criticizing CRT and the practice of vehicle pursuits and flagged 20 officers for potential training or additional supervision because of their involvement in vehicle pursuits or collisions.[23]

112.    Chief Pontillo was forced to resign just a few weeks later.

---

[20] Umansky, E, *How Eric Adams Has Backed a Secretive NYPD Unit Ridden with Abuses*, ProPublica (March 11, 2025), publicly available at https://www.propublica.org/article/eric-adams-nypd-community-response-team-police-nyc-misconduct-transparency.

[21] *Id.*

[22] *DOI's Office of the Inspector General For the NYPD Issues Report Finding Insufficient Public Information About NYPD's Community Response Team and an Absence of Written Policies and Procedures to Guide its Actions*, (Nov. 26, 2024), available at https://www.nyc.gov/assets/doi/reports/pdf/2024/45CRT.Rpt.Release11.26.2024.pdf.

[23] Gonen, Y., Honan, K, Siegel, H, *NYPD Chief Who Criticized Surge in Vehicle Pursuits Ousted*, The City (Aug. 22, 2023), publicly available at https://www.thecity.nyc/2023/08/22/nypd-risk-pontillo-resign-car-chase/.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978)
Excessive Force
(Against Defendants Liandrakis, Roberts, Adhikary, Chell, Daughtry, and the City of New York)

113.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

114.    By using an unmarked police vehicle to intentionally cut off and collide head-on with Plaintiff, throwing him off his moped and crashing onto the ground, Defendants Liandrakis, Roberts, and Adhikary used unreasonable and excessive force under the circumstances.

115.    At the time of the collision, Plaintiff was driving alone in the bike lane and did not pose any threat to the safety of Defendants Liandrakis, Roberts, Adhikary, or others.

116.    At all relevant times, Defendants Liandrakis, Roberts, and Adhikary acted under color of state law within the scope of their employment as police officers for the New York City Police Department.

117.    Defendants Liandrakis, Roberts, and Adhikary acted beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.  Intentionally cutting off and colliding with Plaintiff was a gratuitous use of force that was vastly out of proportion to any danger Plaintiff could have posed.

118.    Defendants Roberts and Adhikary failed to take any steps to prevent the excessive force Defendant Liandrakis used on Mr. Davis or to intervene at any point during the crash, despite having opportunity to do so.

119.    Before, during, and after the violation of Plaintiff's constitutional rights, the City of New York had a policy, practice, and custom of authorizing and encouraging NYPD officers—namely the Community Response Teams—to use unmarked NYPD vehicles to pursue, cut off, and/or collide with other vehicles allegedly in violation of law, notwithstanding and with deliberate indifference to the proportionate risk to such civilian-operators and others.

120.    This policy was implemented and lauded by then-Chief of Patrol and former Chief of Department, Defendant Chell.

121.    The Community Response Teams were formed and overseen by Defendants Chell and Daughtry.

122.    NYPD Chief of Department Chell and Deputy Commissioner Daughtry had final policymaking authority regarding the establishment of policies and practice governing the Community Response Teams' vehicle pursuits.

123.    Chief of Department Chell established and/or ratified the NYPD's policy and practice of authorizing and encouraging NYPD officers to use unmarked NYPD vehicles to pursue, cut off and/or collide with other vehicles. This policy constituted the official policy of the City and was the moving force behind and causing the use of excessive force and malicious prosecution of Plaintiff.

124.    As set forth herein, Defendants Liandrakis, Roberts, and Adhikary acted consistently with and pursuant to the City's policy and practice when they engaged in their conduct set forth above.

125.    The City, acting by and through its policymakers, had knowledge of and was deliberately indifferent to the NYPD's unconstitutional pattern and practice, and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

126.    The City, acting by and through its policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from the NYPD's unconstitutional pattern and practice and was deliberately indifferent to, and/or tacitly authorized same.

127.    The City, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

128.    As a direct and proximate result of Defendants' misconduct detailed above, Plaintiff sustained the damages alleged herein.

**<u>SECOND CAUSE OF ACTION</u>**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Malicious Prosecution
(Against Defendants Liandrakis, Roberts, Adhikary, Hernandez, Rivera, and Zhu)

129.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

130.    Defendants maliciously and without justification commenced criminal proceedings against Plaintiff.

131.    Defendants issued a desk appearance ticket to Plaintiff for reckless endangerment, reckless driving, aggravated unlicensed operation of a motor vehicle, driving the wrong direction on a one-way street, and driving a motor vehicle without a license.

132.    Defendants charged Plaintiff with reckless endangerment falsely, maliciously, in bad faith, and without probable cause.

133.    Defendants acted with malice and knew or were deliberately and recklessly indifferent to the truth that they lacked probable cause to arrest, issue a desk appearance ticket to, and prosecute Plaintiff for reckless endangerment.

134.    No reasonable officer would have believed there was probable cause to prosecute Plaintiff for reckless endangerment under these circumstances.

135.    The desk appearance ticket required Plaintiff to appear in court on pain of criminal prosecution.

136.    On September 12, 2023, the reckless endangerment charge against Mr. Davis was dismissed.

137.    Defendants acted under pretense and color of state law.  They acted beyond the scope of his jurisdiction, without authority of law, and in abuse of his powers, willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

138.    Defendants' conduct was willful, wanton, and reckless.

139.    As a direct and proximate result of Defendants' actions, Plaintiff sustained the damages alleged herein.

<u>**THIRD CAUSE OF ACTION**</u>
42 U.S.C. § 1983 – Fourth, Fifth, Sixth, and Fourteenth Amendments
Denial of a Fair Trial
(Against Defendants Liandrakis, Hernandez, Rivera, and Zhu)

140.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

141.    Defendants, acting individually and in concert, fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiff suffered liberty deprivations and other injuries.

142.    Defendant Hernandez falsely stated in the Police Accident Report, reviewed by Defendant Zhu, that Mr. Davis was traveling in the same lane as the NYPD car, when video

evidence indisputably shows that the NYPD car intentionally crossed from the middle lane into the bike lane to hit Mr. Davis.

143.    Defendants Officer Liandrakis and Rivera knowingly and intentionally provided false information to the New York County District Attorney in connection with the criminal complaint against Mr. Davis, including stating that Mr. Davis "crashed into a police vehicle that was attempting to avoid the collision."

144.    This statement was untrue, was communicated to a prosecutor, and was likely to influence the decision of any jury weighing the evidence presented in a prosecution of Plaintiff.

145.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

146.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CAUSE OF ACTION
42 U.S.C. § 1983 – Failure to Intervene
(Against Defendants Liandrakis, Roberts, Adhikary, Hernandez, Rivera, Zhu, Nazary, Mahoney)

147.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

148.    To the extent that they were not directly responsible for the excessive force, malicious prosecution, and denial of a fair trial, Defendants Liandrakis, Roberts, Adhikary, Hernandez, Rivera, and Zhu had a realistic opportunity to intervene and prevent misconduct by others that caused preventable harm to Plaintiff.

149.    A reasonable NYPD officer in the position of Defendants Liandrakis, Roberts, Adhikary, Hernandez, Rivera, and Zhu would have known that Plaintiff's constitutional rights were being violated.

150.    Defendants Liandrakis, Roberts, Adhikary, Hernandez, Rivera, and Zhu failed to intervene despite having a realistic opportunity to do so.

151.    Defendants Liandrakis, Roberts, Adhikary, Hernandez, Rivera, and Zhu acted under pretense and color of state law.  Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

152.    As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

### FIFTH CAUSE OF ACTION
Common Law Negligence
(Against All Defendants)

153.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

154.    At all times relevant to this Complaint, Defendants owed a duty to Plaintiff to exercise reasonable care in their pursuit of Plaintiff and to refrain from using excessive force.

155.    Defendants breached these duties by their conduct set forth above.

156.    At all times relevant to this Complaint, Defendants owed a duty to Plaintiff to meet the standard of care owed to people detained before trial and to ensure that those under their supervision were trained adequately.

157.    The standard of care required, among other things, proper treatment of Plaintiff's injuries.

158.    Defendants negligently and/or wantonly breached and violated this standard of care, or caused it to be violated, by the foregoing, and by denying Plaintiff access to adequate

medical care, failing and refusing to provide adequate medical treatment, and/or otherwise neglecting Plaintiff's medical needs.

159.    Defendant City of New York, as employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

160.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages alleged herein.

**SIXTH CAUSE OF ACTION**
N.Y.C. Admin. Code §§ 8-802, 8-803– Excessive Force
(Against Defendants Liandrakis, Roberts, Adhikary, Chell, Daughtry, The City of New York)

161.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

162.    N.Y.C. Admin. Code § 8-802 guarantees the right "to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure…"

163.    The acts of Defendant Officers caused Plaintiff to be deprived of this right, as it is granted and guaranteed to him by N.Y.C. Admin. Code § 8-802, to be secure in his person against the use of excessive force.

164.    The acts of Defendants constituted conduct under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

165.    The Defendant Officers, while in uniform, used excessive force to unlawfully seize, search and arrest the Plaintiff in violation of N.Y.C. Admin. Code § 8-802.

166.    The Defendant Officers, while in uniform, continued to confine Plaintiff at the police precinct after they had actual knowledge that he was innocent of wrongdoing, in violation of N.Y.C. Admin. Code § 8-802.

167.    As a result of the foregoing, Plaintiff Delonny Davis was deprived of his liberty, was denied fundamental constitutional rights, and was seriously injured physically.

168.    As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of *respondeat superior*, for the conduct of the Individual Defendants, and for any damages the Individual Defendants caused by and through their conduct.

<u>**SEVENTH CAUSE OF ACTION**</u>
N.Y.C. Admin. Code § 8-803– Failure to Intervene
(Against All Defendants)

169.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

170.    The failure of Defendants to intervene to prevent the exercise of excessive force against Plaintiff deprived Plaintiff of the right to be secure against such illegal acts as it is granted and guaranteed to him by N.Y.C. Admin. Code §§ 8-802, 8-803.

171.    The failure of the Defendant Officers to intervene while other Defendant Officers continued to confine and seize Plaintiff at the police precinct, after they had actual knowledge that he was innocent in fact of wrongdoing and in violation of N.Y.C. Admin. Code § 8-802, caused Plaintiff to be deprived of the right to be secure against such illegal acts as it is granted and guaranteed to him by N.Y.C. Admin. Code § 8-802.

172.    The acts of all Defendant Officers constituted conduct under color of the laws of the State of New York, under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

173.    As a result of the foregoing, Plaintiff Delonny Davis was deprived of his liberty, was denied fundamental constitutional rights, and was seriously injured physically.

174.    As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of *respondeat superior*, for the conduct of the Individual Defendants, and for any damages the Individual Defendants caused by and through their conduct.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff Delonny Davis requests judgment against Defendants as follows:

a.    Compensatory damages in an amount to be determined at trial;

b.    Punitive damages against the Individual Defendants in an amount to be determined at trial;

c.    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.    Such other relief as this Court may deem just and proper.

Dated: New York, New York
     October 15, 2025

WYLIE STECKLOW PLLC

By:

Wylie Stecklow
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
(212) 566-8000

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

Andrew G. Celli, Jr.
Hannah Brudney
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*